FILED

2016 Jun-06 PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JULIET OWENS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 2:15-CV-00815-MHH** |
| } | |
| **CAROLYN W. COLVIN,** } | |
| **Commissioner of the** } | |
| **Social Security Administration,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. §§405(g) and 1383(c), plaintiff Juliet Owens seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied her claims for a period of disability and disability insurance benefits and supplemental security income. After careful review, the Court reverses the Commissioner's decision.

## I.   PROCEDURAL HISTORY

Ms. Owens applied for a period of disability and disability insurance benefits and supplemental security income on August 14, 2012. (Doc. 7-6, pp. 2, 9). Ms. Owens alleges that her disability began on July 10, 2012. (Doc. 7-6, pp. 2, 9). The Commissioner initially denied Ms. Owens claims on November 28,

2012.  (Doc. 7-5, p. 2).   Ms. Owens requested a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 16-17).  The ALJ issued an unfavorable decision on February 4, 2014.  (Doc. 7-3, pp. 11-19).  On March 17, 2015, the Appeals Council declined Ms. Owens's request for review (*Id.* at 1), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. §§405(g) and 1383(c).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).   In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence" or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If the ALJ's decision is supported by substantial

2

evidence, the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.    SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Owens has not engaged in substantial gainful activity since July 10, 2012, the alleged onset date. (Doc. 7-3, p. 12). The

ALJ determined that Mr. Plaintiff suffers from "the following severe impairments: cervical radiculopathy with bilateral upper extremity involvement." (*Id.*). The ALJ also determined that Ms. Owens has type II diabetes and mild atrophy associated with a stroke, but neither is a severe impairment. (*Id.* at 13). Based on a review of the medical evidence, the ALJ concluded that Ms. Owens "does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (*Id.*).

Next, the ALJ determined that Ms. Owens has the residual functional capacity ("RFC") to perform sedentary work except:

> the claimant is able to occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs but never ladders, ropes or scaffolds; must avoid vibration, unprotected heights and hazardous machinery; is able to occasionally reach overhead with right dominant extremity; may perform no overhead work with the left upper extremity; will be off task 10% of the day.

(*Id.*). Based on this RFC, the ALJ concluded that Ms. Owens is not able to perform her past relevant work as a kriller or as a CNA. (*Id.* at 17). Relying on testimony from a vocational expert concerning hypotheticals that the ALJ posed, the ALJ found that jobs exist in the national economy that Ms. Owens can perform, including document preparer, telephone information clerk, and product assembler. (*Id.* at 18). Accordingly, the ALJ determined that Ms. Owens has not been under a disability within the meaning of the Social Security Act. (*Id.* at 19).

4

## IV.   ANALYSIS

Ms. Owens argues that she is entitled to relief from the ALJ's decision because the ALJ failed to properly evaluate her testimony of disabling symptoms consistent with the Eleventh Circuit's three part pain standard.  The Court agrees.[1]

"To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Commissioner of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. (2015) (quoting *Wilson v. Barnhart,* 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)).  A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).  If the ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Wilson,* 284 F.3d at 1225.  "While an adequate credibility finding need not cite particular phrases or formulations[,] broad findings that a claimant lacked credibility . . . are not enough. . . ."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir.

---

[1] Ms. Owens also alleges that the ALJ did not properly evaluate the opinion of Dr. Englert. (Doc. 9, p. 8).  Because the Court finds the first issue meritorious, the Court will not address this additional issue.

1995) (per curiam); *see* SSR 96-7P, 1996 WL 374186 at *2 ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").

Ms. Owens testified at her hearing "I can't do the stuff that I used to do… it's hard, you know, lifting stuff.  And with my neck, it's hard for me to turn my neck certain ways.  And the pain goes through my neck and down my shoulder." (Doc. 7-3, pp. 30, 32).  Ms. Owens testified that she could not cook, clean, do laundry, participate in her stepson's extracurricular activities, or drive due to the pain in her neck.  (*Id.* at 30-31).  Ms. Owens stated that she "can't lift" up her left arm without losing "strength in [her] hand and [her] arm."  (*Id.* at 33).  Ms. Owens reported that she could "lift things over [her] head" with her right arm, but not her left arm.  (*Id.*).  She estimated she could lift "not over five pounds" before losing her grip strength.  (*Id.* at 34).  Ms. Owens testified that her anti-inflammatory medication would occasionally control her pain, but it made her sleepy and made focusing difficult.  (*Id.* at 36).  Even on her medication though, her pain would be debilitating because she is "sitting up all day, and all night."  (*Id.*).  She testified that she spent "at least four or five" hours during normal work hours in bed to

6

control her pain.  (*Id.* at 47).  Ms. Owens testified the severity and intensity of her pain was, on average, a nine out of ten.  (*Id.* at 46).

Taken as a whole, Ms. Owens's subjective pain testimony concerns her neck and her left arm.  Because of the pain in these locations, she alleges that she cannot perform basic domestic tasks, cannot functionally lift with her left arm, and is bedridden at least half of a normal workday.

The ALJ summarized Ms. Owens's testimony.  (*Id.* at 14).  The ALJ properly recited the pain standard by finding that Ms. Owens's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (*Id.*).  The ALJ then found that Ms. Owens's testimony concerning the "intensity, persistence and limiting effects" of her symptoms was not credible.  (*Id.* at 15).

The ALJ stated that "objective medical evidence" and "treatment notes" undermine Ms. Owens's subjective testimony on her "alleged cervical impairments."  (*Id.*).  Substantial evidence does not support the ALJ's interpretation of Ms. Owens's medical records.  Ms. Owens's treatment notes are consistent with her subjective pain testimony.

On July 16, 2012, Ms. Owens visited Dr. Robert Agee at Lemak Sports Medicine.  (Doc. 7-8, p. 119).  Ms. Owens had "pain on palpation of her neck at C5-C6, which is going to the left side.  Which showed decreased sensation on the

left and decreased strength on the other side." (*Id.*).   X-Ray results showed "degenerative disk disease with multiple two level C4-C5, C5-C6 with some neural foraminal narrowing." (*Id.*).   Dr. Agee noted Ms. Owens's chief complaint was "neck pain" and continuing "pain that is going down her left arm." (*Id.* at 118). Dr. Agee did not believe the patient was incredible.

During an August 6, 2012 recheck, Dr. Agee found Ms. Owens had "decreased pain, but still a fair amount of pain." (*Id.* at 117).   Dr. Agee opted to try an epidural treatment and therapy to combat her pain and lack of flexibility. (*Id.*).

On August 27, 2012, Dr. Agee noted that Ms. Owens continued "to have pain in her cervical spine… with radiating [pain] down her left arm.   She continues to hurt on the left side and thinks she has spasm." (*Id.* at 116).   Dr. Agee opined "she still has decreased range of motion.   Still positive Spurling [test].   Pain radiating down her left side." (*Id.*).   Dr. Agee refilled her "medications of Flexeril, Naprosyn, and Lortab." (*Id.*).   He decided to keep her out of work until she could see a specialist, Dr. J. Stanford Faulkner.   (*Id.*).   Dr. Agee noted that Ms. Owens "has had no improvement with the conservative treatment of two epidural therapies, Medrol Dosepak, and pain medication hasn't given her any relief." (*Id.*).

Dr. J. Stanford Faulkner examined Ms. Owens one month later.   Harry Wheelock, PA, wrote the report.  (*Id.* at 115).   Mr. Wheelock noted Ms. Owens's

consistent pain complaints.  (*Id.*).  An examination found "exquisite tenderness to the cervical spine with severe pain on motion and limitation of motion.  Positive Spurling's [test] on the left.  She has got some swelling in her… left shoulder…. She has some weakness in her deltoids especially on the left."  (*Id.* at 114).  An X-Ray and MRI performed on Ms. Owens supported her complaints.  (*Id.*).

Dr. Faulkner examined Ms. Owens on October 3, 2012 to determine if she had a mass in her shoulder.  She did not.  (*Id.* at 110).  The negative test enabled Dr. Faulkner to begin Ms. Owens on a nerve root block to reduce her pain.  (*Id.*). Dr. Faulkner examined Ms. Owens's motion range during this visit.  He found that her spine movement was reduced by roughly half of the normal range.  (*Id.* at 86). Ms. Owens's right arms suffered no real limitations, while her left arm movement was reduced to half of the normal motion range, not counting her near-normal external rotation.  (*Id.*).

On October 29, 2012, Dr. Abiodun Badewa examined Ms. Owens at the request of the State agency.  (Docs. 7-3, p. 16; 7-8, p. 121).  Dr. Badewa noted Ms. Owens "is presented with neck pain…. It is described as aching and chronic…. The frequency of episodes is daily…. It is radiating down the left arm. The complaint is severe 8/10."  (Doc. 7-8, p. 121).  During the consultative examination, Dr. Badewa tested Ms. Owens's flexibility and confirmed Dr.

Faulkner's results from earlier in the month.  (*Id.* at 125).  Dr. Badewa did not note a specific cause of the pain during the examination.

In 2013, Ms. Owens started receiving treatment at Cooper Green after losing her insurance.  (Doc. 7-3, pp. 44-45).  During a March 14, 2013 visit, Dr. Nassif Cannon noted that Ms. Owens had several blocks but continued to experience pain "to her left arm and back from neck."  (Doc. 7-8, p. 139).  Ms. Owens's vertebral bodies were tender, her left arm strength was "3/5," and when she elevated her left arm, she experienced a "tremor" with "decreased sensations."  (*Id.* at 140).  Like the physicians before him, Dr. Cannon did not find Ms. Owens's account of her pain to be incredible.

On May 17, 2013, Ms. Owens saw a Cooper Green neurologist for "[n]eck and shoulder pain."  (*Id.* at 137).  Ms. Owens complained "of worsening pain, which rates a 7-9 of 10 and varies throughout the day, but is present every day. She also complains of left hand and arm 'tingling' and pain progressing from her neck to her right shoulder."  (*Id.*).  The examining physician ordered an MRI of Ms. Owens's cervical spine to compare her current results to those from an MRI in July 2012.  Treatment records from this visit indicate that "conservative medical management" had failed and that Ms. Owens "continues to have pain."  (*Id.* at 138).

Medical records from June 12, 2013 present one exception to Ms. Owens's longitudinal treatment history:  her left and right arms had a "full range of motion," though her cervical spine was still "limited."  (*Id.* at 136).  The limited movement was accompanied by "neck pain."  (*Id.* at 135).

On August 2, 2013, Ms. Owens returned to Cooper Green's neurology clinic.  (*Id.* at 132).  Under general observations, the doctor wrote, "patient sitting on bed, apparently in pain."  (Doc. 7-8, p. 133).  Ms. Owens reported that since her visit in May, she believed her pain had "been stable and somedays a bit worse." (*Id.*).  Ms. Owens complained that "she has knots of her [left] shoulder and her [right] thumb gets stuck."  (*Id.*).  She rated her pain as "7-9 of 10," varying throughout the day.  (Doc. 7-8, p. 132).  Treatment records revealed that Ms. Owens "has been relying heavily on her husband to help with chores around the house for the past year.  Her husband thinks that things have been about the same over the past year."  (*Id.*).  The physician referred Ms. Owens to the pain clinic at UAB.  (*Id.* at 133).

On December 6, 2013, Ms. Owens reported "having continued cervicalgia with pain radiating down her arm as well as paresthesias in her hand."  (*Id.* at 128). A neurological exam found "pronounced weakness as follows: WE 3/5, WF 4/5, HI 4/5, APB 3/5, FE 3/5."  (*Id.* at 129).  All other neurological signs appeared normal with the exception of decreased senses in C6-7 on the right and median

nerve distribution on the left.  (*Id.*).  During this visit, Ms. Owens's neurologist reviewed an MRI from September 9, 2013 and noted multi-level mild degenerative changes from C2-3 to C6-7.  (*Id.* at 130).  The neurologist diagnosed Ms. Owens's with "likely cervical radiculopathy, failing conservative medical management . . . and continues to have pain, now with sudden onset of profound weakness of right arm with exam findings concerning for acute C6-7 radiculopathy.   Left extremity symptoms have progressed subtly to involve sensory loss as C7 dermatome."  (*Id.*).  The neurologist ordered an additional MRI of Ms. Owens's cervical spine "[d]ue to acute change over the last 24 [hours] and concern for right sided cervical (C6-7) radiculopathy based on examination with profound weakness and sensory loss."  (Tr. 412).   The neurologist also refilled Ms. Owens's "Mobic, Neurontin, and muscle relaxer."  (*Id.*).

This medical evidence is consistent with Ms. Owens's subjective pain testimony.  The records contain no statement by a doctor indicating Ms. Owens's neck or arm condition was less severe than she described, and there is no indication that Ms. Owens's description of her limited daily activities was inaccurate.  *See* 20 C.F.R.  §416.929(c)(3) (relevant factors to consider when weighing subjective pain testimony include "daily activities," severity of pain symptoms, "aggravating

factors," "medication," and treatment received).[2]    Accordingly, substantial evidence does not support the ALJ's decision to discredit Ms. Owens's testimony regarding her neck and left arm pain.  *See* SSR 96-7P 1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements.").[3]

Because substantial evidence does not support the ALJ's credibility determination, the Court will remand this action to the Commissioner.  *Powell v. Astrue*, 250 Fed. Appx. 960, 964-65 (11th Cir. 2007) ("[B]ecause neither of the

---

[2]  The ALJ seemed to question Ms. Owens's credibility generally.  The ALJ challenged Ms. Owens's report that she was told that she experienced a TIA in December 2013, and the ALJ remarked that she was unable to find objective support for Ms. Owens's description of the severity of her diabetes.  (*See*, *e.g.*, Doc. 7-3, pp. 33, 35).  The medical records indicate that Ms. Owens had chronically high blood sugar in 2011, and a December 2013 medical record substantiates the report of a TIA.  (Doc. 7-8, pp. 21, 22, 27, 29, 128).  The credibility issue in this case focuses on Ms. Owens's credibility as it pertains to her reports of neck and arm pain.

[3]  During her administrative hearing, Ms. Owens admitted that in 2012, Dr. Faulker opined that she could perform "light duty" work.  (Doc. 7-3, p. 43).  The ALJ found that "treatment records from December 2013 … support a reduction [from light work] to sedentary work as described in the residual functional capacity outlined herein."  (*Id.* at 17).  Objective medical evidence demonstrates that Ms. Owens's neck and arm pain worsened after Dr. Faulkner's 2012 examination. (Doc. 7-8, p. 130).  Therefore, Dr. Faulkner's 2012 opinion does not change the result here.  *See Crow v. Colvin*, 36 F. Supp. 3d 1255, 1262 (N.D. Ala. 2014) ("[T]he medical evidence and the ALJ's own findings demonstrate that Crow's impairments deteriorated after Dr. Bowling's treatment in 2005. Consequently, Crow's ability to work in 2005 does not provide substantial evidence to discredit her testimony that she suffers from disabling limitations in 2009.").

ALJ's reasons for discrediting Powell's incontinence testimony amounts to substantial evidence supporting his decision to reject that testimony, we must remand this case so that the ALJ can re-assess the effect of Powell's claimed incontinence after either accepting her testimony or by articulating an adequate reason to reject it").

## V.    CONCLUSION

For the reasons discussed above, the Court remands the decision of the Commissioner for reevaluation of the subjective testimony as it relates to Ms. Owens's neck and left arm pain.  The Court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this June 6, 2016.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE